JEHLE et al. v. ELLICOTT SQUARE CO. OF BUFFALO.

(Supreme Court, Appellate Division, Fourth Department. June 18, 1898.)

1. NEGLIGENCE—UNFINISHED BUILDINGS—ELEVATORS—INDEPENDENT CONTRACTORS.

In an action for the death of plaintiffs' intestate, caused by iron tools falling on him while he was working in the freight elevator shaft of defendant's building, as a servant of a firm which was furnishing the rooms of a lessee therein, and while loading a refrigerator on the elevator to be taken up to said rooms, it appeared that defendant company, as owner, had not accepted the building from the independent contractors who were engaged in finishing the structure, though the company had commenced making leases to tenants, who were moving in; that servants of a subcontractor were working at the top of the shaft, putting in indicators for the elevator, and that one of them dropped the tools which killed intestate; that intestate and his employers knew that the building and the elevator was unfinished and incomplete, and that the contractors were still working on it; and that intestate's foreman knew that work was being done at the top of the shaft at the time the refrigerator was being loaded. *Held*, that the company was not liable, since the negligence, if any, was that of the servants of the subcontractor.

2. SAME—DEGREE OF CARE.

Owners of an unfinished building are required to use only reasonable care to keep the premises in such condition that those who visit them will not be unreasonably or unnecessarily exposed to danger.

Appeal from trial term, Erie county.

Action by Mary Jehle, as administratrix, and Fred W. Jehle, as administrator, of the goods, chattels, and credits of Valentine Jehle, deceased, against the Ellicott Square Company of Buffalo, to recover

damages for the death of intestate. From a judgment entered on a nonsuit, plaintiffs appeal. Affirmed.

Plaintiffs' complaint alleges: That on the 14th of May, 1896, the defendant was a domestic corporation, organized under the laws of the state of New York, and "was the owner of a certain building situated in the city of Buffalo, called 'Ellicott·Square,' and was in full possession and control thereof. That said building was and is ten stories high, and was and is designed for and used as an office building, in which rooms and offices were rented by the defendant to tenants for hire. That said building was furnished, for the use and convenience of defendant's tenants, their agents, servants, visitors, and employés, with elevators in which to convey passengers who might desire to visit the rooms and offices in the said building, and to transport furniture, fixtures, and freight to and from the offices of the said tenants during all times herein mentioned. During all times herein mentioned, said building and said elevators were open to the public, and in use by the defendant, its tenants and their visitors, and said defendant invited and induced the public and plaintiffs' intestate to use said elevators. That, during all the times herein mentioned, the Ellicott Club was a tenant of said defendant, and occupied a portion of the tenth floor of said Ellicott Square. That on the said 14th day of May, 1896, the John C. Jewett Manufacturing Company was, at the request of said Ellicott Club, engaged in furnishing and delivering, to said rooms of said Ellicott Club, certain parts of a refrigerator, and the said Valentine Jehle, then and there being in the employ of the John C. Jewett Manufacturing Company, was lawfully engaged in assisting in the delivery of said parts of said refrigerator. That on the said 14th day of May, 1896, while said Valentine Jehle, employed as aforesaid, was lawfully on one of said elevators in defendant's said building, he was hit on the head by an iron instrument, dropped down said elevator shaft, negligently and carelessly, by a man or men working at the top of the said shaft, whereby the skull of the said Valentine Jehle was fractured, and from the effects of which fracture said Valentine Jehle thereafter died. That said injury and death of said Valentine Jehle were wholly due to the negligent and careless manner in which defendant, its servants, agents, and employés, used, occupied, maintained, and operated said building, elevators, and elevator shafts, and in no respect due to any contributory negligence on the part of said Valentine Jehle." The due appointment and qualification of the plaintiffs as administrators of the estate of —— Jehle is also ⸰alleged. The answer admits the allegations of the complaint as to the incorporation of the defendant, and admits that it "was the owner of a certain building situate in the city of Buffalo, called 'Ellicott Square.'" The answer, however, denies that it was "in full possession and control thereof" on the 14th of May, 1896. The answer admits that the building "was and is ten stories high, and was and is designed for and used as an office building, in which rooms and offices were rented by the defendant to tenants for hire. It admits that said building was furnished with elevators in which to convey passengers, and it admits that some of said elevators were used to transport furniture, fixtures, and freight to and from the offices of said tenants." It denied that "said elevators mentioned in the complaint were opened to the public or in use by the defendant, its tenants and their visitors; and it denies that during the times mentioned in the complaint the defendant invited and induced the public or the plaintiffs' intestate to use said elevators." "It admits that a portion of said building and a part of the elevators located therein were open to the tenants of said building and the public having business with said tenants. It admits that the Ellicott Club, at the time of the death of plaintiffs' intestate, was a tenant of said defendant, and that said club occupied a portion of the tenth floor of said building. * * * It admits that on the 14th day of May, 1896, said Valentine Jehle was hit on the head by an iron instrument dropped down an elevator shaft by a man or men working at the top thereof, and that said Valentine Jehle afterwards died from the effects thereof." Defendant's answer denies all allegations of negligence alleged in the complaint against defendant. At the time of the deceased's death, he was in the employ of the John C. Jewett

Manufacturing Company, receiving nine dollars per week wages, and was 41 years of age.

Tibbins testified that on the 13th and 14th of May, 1896, he was superintendent of Ellicott Square Building; "that he was present in the building, and remembers the occasion on the 14th of May, 1896, when two men," Jehle and Purdy, met their death in the Ellicott Square Building; that the accident occurred about 10:20 o'clock in the shaft of the elevator now known as "No. 12," on the Washington street side of the building; that this elevator is an end elevator on the right-hand side as you go into the building from the Washington street entrance; "that the elevator was used for freight only"; and he adds that it had been used "for freight and passengers at the same time, or freight accompanied by passengers." The witness testified that he saw it used on the 14th of May, and had seen it so used for a month prior to that time, off and on. He testifies that, "besides the Jonathan Clark, Sons & Company's men, witness saw said elevator being used by one Jack Huthmann, who was in the employ of the Ellicott Square Company; that at that time this elevator was being used for taking up some furniture for one of the tenants in the building"; that witness saw others using the elevator for the purpose of taking up furniture and fixtures between the dates April 27th and May 14th. He further testified "that this elevator was frequently in use between those dates for the purpose of transporting furniture from one story of the building to another; that at those times the Ellicott Square Company had rented offices to tenants in the building, which tenants were then occupying their offices; that witness himself had not operated the elevator in the transportation of any freight; that no other man than Huthmann had used this elevator for hoisting freight; that witness had seen other elevators than this one used for the same purpose; * * * that there was a platform built of two-inch plank constructed on top of the elevator, and very nearly the full size of the elevator cage; that on the morning of the 14th of May, 1896, men were engaged in work inside and at the top of that elevator shaft; that there were two of them, and they were engaged in putting in some beams to support the running gear of the indicators, which indicators were to show the people on different floors the positions of the elevator by a dial; that the elevator shaft is and was entirely open from top to bottom; that, while they were working there, there was nothing immediately underneath these men, who were working at the top of the shaft, to catch falling tools or anything of the sort; that there was no covering over the top of this platform at that time; that the men were working in the attic, above the tenth floor; that at the time of the accident the elevator was in the basement, and the platform on top of the elevator was about on a level with the first floor; that witness noticed the elevator being used that morning to carry goods up to the Ellicott Club, but did not notice what men were on it at the time, or who was operating it; that the platform on top of the elevator was made by the Jonathan Clark, Sons & Company, and had been there for some time; that the purpose of it was for hoisting freight and building material to the upper floors and the roof; * * * that he had seen the men and freight transported on that platform before this occasion, as well as on the day of the accident; that on the morning of the accident the Ellicott Club were tenants of the Ellicott Square Company, and were getting ready to occupy the club rooms on the tenth floor of this building." The witness had been superintendent of the building from the 6th of April, and had his office in the building. He testified, viz.: "That his duties consisted in looking after the building in a general way, keeping it in good order, hiring all employés except the ones in the engineering department, such as janitors, ushers, elevator boys, and men and women to do the cleaning; and that he had in charge the building, except the machinery, which was under the engineer, on the 14th of May, 1896, when the accident occurred." The witness stated that he knew whether the Ellicott Square Company had accepted the building from the contractor. Thereupon the following question was put to him: "Q. And what is the fact as to whether it had been accepted from the contractors or not?" This question was objected to, and the objection overruled, and an exception was taken by the plaintiffs. The witness answered: "A. It was only accepted conditionally, to the best of my knowledge. Q. State what the fact is with regard to the condition of the

elevator, with the elevator shafts, part of them or all of them. * * * A. The elevators were not at that time fully completed. That the indicators had not been put on. That there was painting to be done in the shafts and on the cars, mirrors to be put into the cars, some cables to be stretched, the pits were not completed; and that there were men working in and about these elevators at various stories, more or less all the time. Q. Whose men were they? * * * A. They were the men of the subcontractors of the first contractors, Jonathan Clark Sons Company. Q. Did the Ellicott Square Company have the general contract for the construction of the entire building—for the elevators and cars and everything—with one contractor? * * * A. To the best of my knowledge and belief, they did. That this general contractor was Jonathan Clark, Sons & Company, of Chicago. That the Otis Manufacturing Company, as subcontractors of the company, put in the elevators. That the Burdette-Rowntree Company, as subcontractors under the Otis Manufacturing Company, put in the indicators. That the men who were working up at the top of the shaft in which the freight elevator was were employés of the Burdette-Rowntree Company. That witness is the man, if anybody, who had the duty of employing the men and putting them in that freight elevator to run it for the Ellicott Square Company at all times. That witness had never employed or authorized any man to run that elevator for the Ellicott Square Company, except one man, Huthmann. That on the 27th of April, 1896, or thereabouts, Huthmann was in charge of this elevator, and endeavored to raise a large safe. That one of the cables became foul at that time, when the safe had been lifted only about two and one-fourth feet from the ground floor. That Philips, the foreman for the Otis Manufacturing Company, thereupon put his man Kelly on, to run the elevator; and any heavy work thereafter, in the way of heavy safes or anything of the sort, was hoisted up by Philips or Philips' man Kelly." Huthmann remained in the employ of the Ellicott Square Company, and his business was running the freight elevator. During the last few days of April and the first of May, he was mostly acting as starter of elevators at the entrance on the Washington street side of the building. The witness further testified, viz.: "That the Jonathan Clark Sons Company had put this platform on top of the elevator cage, and that the said company stopped using that elevator, and turned it over to the Ellicott Square Company, several weeks after the 14th of May, 1896." This witness further testified that Jonathan Clark, Sons & Co. was using the elevator in moving "lumber and sand and plaster and gravel and cement, and such materials as that; that this material at that time was being moved mostly to the attic, and at the time there was a great deal of work going on, on the 6th, 8th, and 10th floors, and on the roof; that at that time a kitchen was building for the use of the club, on the roof; that this man Kelly, who operated the elevator under Green, for the contractors, was not in any way employed or paid by the Ellicott Square Company." It appeared that the subcontractors who were putting up the indicators did not complete their work until about the 1st of June. The witness says that on the 14th of May, or the 13th of May, he did not give to any one representing or acting for the John C. Jewett Company authority to take up their materials on this freight elevator, and he adds that no one asked him for such permission, and he denied that any person asked any officer or employé of the Ellicott Square Company, to his knowledge. He adds, however, that he saw this elevator in operation about 8 o'clock on the morning of the accident. It further appeared by this witness' testimony "that from the 15th of April the freight elevator had been used off and on by the Ellicott Square Building in hoisting office furniture, safes, etc.; that sometimes it would be operated by the Ellicott Square Company's men, and sometimes by Mr. Clark's men; that it is a fact that this refrigerator was for the Ellicott Club, and that they are and were tenants of the Ellicott Square Company; that at no time prior to the accident was witness given specific instructions by the Ellicott Square Company that he was to have exclusive control of the elevators, and that no one else was to operate them without witness' permission." This witness further testified "that it is also a fact that sometimes the elevators would be operated by his men, and sometimes by Clark's men, but generally by Clark's men; that it was only rarely that Philips and Green would let witness have temporary

charge of the freight elevator; that Mr. Philips represented the Otis Manufacturing Company, and Mr. Green represented Mr. Clark, as foreman of laborers; that witness does not know of his knowledge who gave this Jewett Manufacturing Company the right to use this freight elevator either on the 13th or 14th of May, 1896, if any one did."

Evans, a witness called for the plaintiff, testified that he was an assistant "to the secretary, Mr. Day, of the Ellicott Square Company. In May, 1896, I had charge of renting offices. My office was on the 6th floor on the Washington street side, in the same room with Mr. Day's office. My position then was the same as it is now. I exhibited offices to tenants or possible tenants or applicants who desired to see them, and, when leases were made, informed the tenants when they might take possession, and how. These and similar details constituted my duties."

The witness Jewett testified that he went with Alexander, the manager of the club, to the office, and saw Evans, and that an arrangement was made through the means of Alexander, with the assent of Evans, that the Jewett Company might have the use of the elevator on the morning of the 14th; and the witness adds: "When Mr. Alexander and Mr. Evans went to the man apparently in charge of the elevators, and had the conversation with him, I believe Mr. Alexander did most of the talking. When Mr. Alexander and I went to the Ellicott Square Company, and Mr. Alexander asked Mr. Evans, if he could get the use of the elevator for the following morning, Mr. Evans said he was just going downstairs, and would go down with us, and then the transaction that I have described took place. My men had used the elevators before, and I had before this gone to Mr. Alexander to get permission to use the elevators. I do not recollect ever going to the office of the company to get permission to use the elevator before this time."

The plaintiffs called one Keil as a witness, who was aiding in the service of the Jewett Company in making the removals to the club room, and who witnessed the accident. This witness stated that he "saw two fellows at work at the top of the elevator shaft. I think it was before the accident. There was no covering over the platform on the elevator, and there was nothing in the shaft underneath those men working up there. At the time of the accident, I had not been using the elevator very long. I can't tell exactly how long. I guess two loads had been taken up, or something like that. * * * We had on the top of the elevator on the platform this top of the refrigerator, but we wanted to set it on even. We did not have it just exactly on, and we were moving it around when that happened. * * * Mr. Brunner, Charles Phfeil, Purdy, and Jehle were also on the inside of the elevator. I heard some noise, and, as soon as I heard the noise, I was just like stunned myself; and, when Mr. Brunner called me, I went over there, and saw them. Can't say where the noise came from. It sounded like iron. The first thing I saw after I heard the noise was Purdy and Jehle lying there. * * * I saw a piece of iron near the bodies when they laid it out. It looked like a thumb screw, only bigger. I do not know what the name of it is. Some one called it 'old man' round there. I have heard it spoken of as 'old man.' It looks like a heavy steel tool. * * * The elevator is one that is called the 'freight elevator.'" In the course of his cross-examination he said: "One of the men working up above was sitting on a beam. Maybe it was a board right up above. I didn't exactly look at what he was doing, but I saw him there. I think there were two of them. When I say that we were in the elevator at the time that these men got hurt, I mean on top of the elevator, on top of the platform. The whole five of us were there, but we were not inside the elevator,—that is, not inside the cage; and all at once something fell, and the two men were killed."

Brunner, the foreman of the Jewett Manufacturing Company, was called as a witness, and testified that he was present and saw the accident. He testified: "I did not notice what was being done upon this elevator in question before I took possession of it with my men. * * * The dimension of the piece of refrigerator top that we were taking up was 7 by 9 feet. When we loaded on this piece of refrigerator, the elevator was in the basement, on a level with the main floor. When we laid this piece on, Purdy was away in, on the inside of the elevator, near the wall, and Jehle was near to the door..

Just at that time I heard a kind of a noise. I happened to look up, and saw this piece of iron, and jumped back, out of the way. * * * When I saw the men, they were just sitting on a beam extending across the shaft diagonally, about 10 or 12 feet above the tenth floor; that is, direct over the elevator that we were working on. * * * When I was helping the men out, I saw not only this thing called an 'old man,' but the bolt; saw them both at the same time."

At the close of the evidence, the defendant moved for a nonsuit, on the grounds "that the evidence does not tend to show any cause of action against the defendant, and no negligence on the part of the defendant is shown causing or contributing to the accident," and "on the ground that it appears that the accident was due to the negligence of the employés of some other party, and not of the defendant at all." The motion was granted, and the plaintiffs excepted.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Frederick H. Pomroy, for appellants.
John G. Milburn, for respondent.

HARDIN, P. J.   According to the evidence given in the case in hand, the defendant had not accepted the building from the contractors who were engaged in maturing the building under a contract with the defendant.   The defendant had not accepted the building or offered it to the public for use.   True, it had commenced making leases to tenants of sundry portions of the building, and the tenants were engaged in the process of fitting up the portions rented of the defendant.   When the Jewett Manufacturing Company took the contract from the Ellicott Club to furnish the club rooms, the Jewett Manufacturing Company and its servants and employés knew that the building was incomplete, and that the defendant had not accepted it, and that the control of the building was in the hands of Jonathan Clark, Sons & Co., the contractors who were engaged in the process of maturing the building.   That condition appears to have been well understood by the Jewett Manufacturing Company, and inferentially by the employés of the Jewett Manufacturing Company, including the deceased.   The learned counsel for the appellants calls attention to Sterger v. Van Sicklen, 132 N. Y. 499, 30 N. E. 987.   In that case the plaintiff went to the defendant's house, not at the occupant's invitation or on a matter of common interest, and, on coming out, one of the steps broke, and she received the injuries complained of; and it was held that no case for recovery was made out by the evidence.   That case does not sustain the contention of the appellants.

It is also contended in behalf of the appellants that "it was the defendant's duty to exercise reasonable care in maintaining the premises and the means of entrance and departure at all times in such condition that others entering their building upon business might enter and depart with safety"; and cases are cited in support of the general proposition thus contended for.   However, the evidence in the case in hand indicates that the defendant was not in possession of the property in the full, broad sense included in the assumption made by the argument just mentioned.   On the contrary, the defendant had contracted for the construction of the building, and

that construction had been given out to Jonathan Clark, Sons & Co.; and they were maturing the building, and were entitled to control its management and the manner in which it should be used. Besides, it was an independent contractor, having a right to control the property. Neumeister v. Eggers (Sup.) 51 N. Y. Supp. 481. The defendant was required to use reasonable prudence and care to keep its premises in such condition that those who visited it would not be unreasonably or unnecessarily exposed to danger.

In Hart v. Grennell, 122 N. Y. 371, 25 N. E. 354, it was said:

"The law, however, does not require warranty of the safety of those coming upon their premises. A merchant may place in his store the usual and proper appliances for conducting his business, and when placed in full sight, and not so as to threaten danger, the merchant is not liable for injuries to a visitor occasioned thereby."

In the case in hand it is made clear by the evidence that the John C. Jewett Manufacturing Company was aware that the defendant's building was incompleted, and that the elevator and its appendages were approaching completion; and the foreman of the John C. Jewett Manufacturing Company testifies that he was aware that people were at work on the indicator at the time he attempted to load the refrigerator upon the deck of the elevator. So far as the evidence discloses, the workmen upon the indicator were independent contractors, for whose acts of negligence the defendant is not responsible. They were not in any just sense employés of the defendant under such circumstances as to make the defendant liable for their acts of negligence. Ferguson v. Hubbell, 97 N. Y. 507.

In King v. Railroad Co., 66 N. Y. 181, it was held that:

"An owner of real property is not liable for injuries resulting from negligence on the part of a contractor or his employé engaged in performing a lawful contract for specific work upon the premises. The law will not impute to one person the negligent act of another, unless the relation of master and servant exists." Engel v. Eureka Club, 137 N. Y. 103, 32 N. E. 1052.

The evidence in this case shows that the use by John C. Jewett Manufacturing Company and its employés of the elevator was not the ordinary use of an elevator in a completed building, under conditions which impose upon the owner the duties and obligations which are asserted by the appellants. The situation was patent and visible to the deceased, as well as to his immediate employer, John C. Jewett Manufacturing Company. When the John C. Jewett Manufacturing Company borrowed the use of an elevator, they borrowed the use of an incomplete, unfinished elevator, knowing that there was no guard or protection to prevent the tools or materials that were being used by parties at work on the indicator from falling down the well upon persons who should venture inside of the well in or near the basement. The circumstances surrounding the building quite negative any obligation on the part of the defendant to furnish a fully-equipped elevator. The evidence fails to present a case of negligence on the part of the defendant, the corporation, causing the injuries complained of. If the evidence indicated that the defendant had opened its elevator to the public, induced or influenced the public, or the deceased as a part of the public, to use

it under the ordinary assurance that the elevator was safe and suitable for use, a different case would be presented from the one now in hand. Undoubtedly, the law is quite stringent in respect to the liability of parties operating an elevator for hire or for accommodation of the public; but the condition in which the defendant was situated—its relation to the uncompleted building and the uncompleted elevator, and its appendages—distinguish this case from the ordinary case arising where the liability of an elevator company or proprietor thereof is asserted. We fail to find any proper predicate for sustaining an averment of negligence against the defendant in the evidence in this case. We must therefore sustain the nonsuit.

Judgment affirmed, with costs. All concur.